Diann TATE, Individually and as the Personal Representative of the Estate of Dale Tate, and as Natural Guardian of Jason Tate; Brian Tate; Vivian Marie Johnson, Individually and as the Personal Representative of the Estate of Veltry Herman Johnson III; Angela Wooden; and Nancy Ann Schulz, Plaintiffs–Appellants,

v.

BOEING HELICOPTERS, an unincorporated division of Boeing Company, and Breeze–Eastern, an unincorporated division of Transtechnology Corporation, Defendants–Appellees.

No. 93–5863.

United States Court of Appeals,
Sixth Circuit.

Argued June 3, 1994.

Decided June 2, 1995.

Mark A. Rassas (briefed), Clarksville, TN, Francis G. Fleming (briefed), Daniel M. Kolko (argued and briefed), Kreindler & Kreindler, New York City, Lucius P. Hawes, Jr., (briefed), Hawes, Richardson, Cameron & Burman, Hopkinsville, KY, for plaintiffs-appellants.

Richard L. Walter, Boehl, Stopher, Graves & Deindoerfer, Paducah, KY, Steven S. Bell (argued and briefed), Perkins Coie, Seattle, WA, Ronald A. McIntire, Perkins Coie, Los Angeles, CA, Carol D. Browning (briefed), Stites & Harbison, Louisville, KY, Bruce G. Shanahan (briefed), Kirtland & Packard, Los Angeles, CA, for defendants-appellees.

Before: KRUPANSKY and RYAN, Circuit Judges; SPIEGEL, District Judge.*

RYAN, Circuit Judge.

The defendants built and sold to the Army a helicopter that crashed during a training mission in July 1990. Three crew members were killed and two others were injured. One of the survivors, and family members of two soldiers who perished, brought this diversity action under Kentucky law, alleging theories of design defect and failure to warn. The district court granted summary judgment for the defendants based on the gov-

---

* The Honorable S. Arthur Spiegel, United States District Judge for the Southern District of Ohio, sitting by designation.

ernment contractor defense established in *Boyle v. United Technologies Corp.*, 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988), and dismissed the case. We affirm summary judgment for the defendants as to the design defect claim, but vacate and remand as to the failure to warn claim.

## I.

On the night of July 24, 1990, five Army soldiers were on a training mission aboard a CH–47D Chinook helicopter at Fort Campbell, Kentucky. On board were Chief Warrant Officer Dale Tate, the instructor pilot; Second Lieutenant Nancy Schulz, the copilot; Staff Sergeant Veltry Johnson III, the flight engineer instructor; Specialist Lee Jordan; and Specialist Carlos Clyburn. The purpose of the training mission was to teach the crew members, while using night vision goggles, to attach heavy equipment to a hook and sling system on the underbelly of the helicopter, and then lift the load, fly to a new position, and set down the equipment. While Lieutenant Schulz was at the controls, the crew attached a 15,760 pound concrete block to the helicopter using the aircraft's hook and sling system. Schulz lifted the load and flew the aircraft toward the predesignated drop site. Within minutes she encountered a hill in the flight path. As Schulz flew over the hill, the crew heard a loud noise. According to an Army investigation board, the noise distracted the crew, and they allowed the block to lodge into the hillside. Schulz tried to free the load by releasing the hooks; however, the sling and the concrete block did not separate from the helicopter's hooks. Schulz tried to level the helicopter, but the block served as an anchor, and the aircraft pitched forward into the ground. Of the plaintiffs, Tate and Johnson died, and Schulz was injured.

Three hooks, situated forward, center, and aft, are mounted on the CH–47D's underside. Each hook's throat opening faces forward. Guarding the throat opening is a spring-loaded "hook keeper." When a cable or ring is strung onto a hook, the hinged hook keeper retracts, allowing the cable or ring to pass. The hook keeper then springs back to its original position. The strung cable or sling, which is attached to the load below, then comes to rest on the "bottom" of the hook which is called the "load beam." For maximum stability, the CH–47D uses the forward and aft hooks in tandem to carry a single load. The hooks are not mounted rigidly to the CH–47D's airframe; they pivot on their base, longitudinally, forty degrees. The load beam portion of the hook is hinged just as the hook keeper is. However, it is fixed in a horizontal position, unless electronically released from that position by a crew member. When cargo being carried in tandem is to be off-loaded, the pilot electronically actuates the load beams, which unlocks the load beams from their horizontal positions. The cargo's weight on the slings then pulls the load beams downward into a generally vertical position, the slings slip away from the hook system, and the power springs return the load beams to their original, horizontal, locked positions.

On the night of the accident, the helicopter was carrying the concrete block using the forward and aft hooks in tandem. Apparently, when Lieutenant Schulz tried to detach the block, the sling attached to the aft hook came free; however, the forward sling remained on the forward hook. The plaintiffs claim that the forward sling remained because there was insufficient tension in that sling to pull the hook's hinged load beam downward. The concrete block was resting on the ground, so the sling was slack.

The plaintiffs point to three design features they claim were responsible, at least in part, for the crash. First, the forward hook's forward-facing orientation made it more difficult for the sling attached to the concrete block to slide off the load beam than if the hook had faced aft. Second, the load beam's limited range of rotation—the forty degree pivot of each hook—increased the difficulty of releasing a slack sling. Third, the load beam's degree of curvature helped prevent the sling from sliding off the hook. The plaintiffs also claim that the defendants failed to provide adequate warnings under Kentucky tort law.

The district court entered summary judgment for the defendants based on the government contractor defense and dismissed

the case, assuming, apparently, that the defense displaced the plaintiffs' failure to warn claim as well as design defect claim. The plaintiffs filed this timely appeal.

## II.

■■■ We review a grant of summary judgment *de novo*, applying the same test as used by the district court. *Brooks v. American Broadcasting Cos.*, 932 F.2d 495, 500 (6th Cir.1991). And we view the evidence in the light most favorable to the nonmoving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). Under Federal Rule of Civil Procedure 56(c), summary judgment is proper if all the evidence before the district court " 'show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to [a] judgment as a matter of law.' " *Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc.*, 862 F.2d 597, 601 (6th Cir.1988) (quoting Fed.R.Civ.P. 56(c)).

■■■ The plaintiffs first complain that, as to the design defect claim, the evidence fails to establish the three conditions required to apply the government contractor defense as detailed in *Boyle*, 487 U.S. at 512, 108 S.Ct. at 2518–19. In *Boyle*, a Marine pilot drowned when the helicopter he was flying crashed into the ocean off the Virginia coast. The pilot survived the impact, but could not escape from the sinking helicopter. The pilot's estate alleged, as one theory of liability under Virginia tort law, that the helicopter manufacturer defectively designed the escape hatch to open outward instead of inward, and, as a result, the hatch could not be opened when the aircraft was submerged. The pilot's estate recovered under a general verdict. *Id.* at 503, 108 S.Ct. at 2513–14.

The *Boyle* Court held that, under certain circumstances, government contractors are immune from state tort liability for design defects in military equipment. This defense was created to protect the "uniquely federal interest" that is involved where state tort law imposes liability on government contractors for design defects: "either the contractor will decline to manufacture the design specified by the Government, or it will raise its price." *Id.* at 507, 108 S.Ct. at 2516. The existence of a uniquely federal interest does not, however, alone justify "displacement" of state law. *Id.* There must also exist a " 'significant conflict' " between the federal interest and the application of state law. *Id.* (quoting *Wallis v. Pan Am. Petroleum Corp.*, 384 U.S. 63, 68, 86 S.Ct. 1301, 1304, 16 L.Ed.2d 369 (1966)).

In matters of liability claims arising from government procurement contracts, a "significant conflict" could arise between state tort law and the federal interest in immunizing the federal government from liability for performing a "discretionary function," an act for which the government may not be sued under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2680(a). *Id.* at 511, 108 S.Ct. at 2518. Selecting the design of military equipment surely is a discretionary function: "It often involves not merely engineering analysis but judgment as to the balancing of many technical, military, and even social considerations, including specifically the trade-off between greater safety and greater combat effectiveness." *Id.* If government contractors were held liable for defects in designs approved by the government, then the discretionary function exemption would afford little protection to the government; the contractors would simply pass through the tort liability to the government via higher contract prices. *Id.* at 511–12, 108 S.Ct. at 2518–19. Thus, state tort law could frustrate the federal interest in permitting the government to exercise discretion in choosing military equipment designs.

The Court concluded:

Liability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States.

*Id.* at 512, 108 S.Ct. at 2518. The first two conditions "assure that the design feature in question was considered by a Government

officer, and not merely by the contractor itself." Only when the government performed its discretionary function would state tort law liability frustrate a federal interest. *Id.* The third condition removes the incentive the contractor would have to withhold knowledge of dangers, "since conveying that knowledge might disrupt the contract but withholding it would produce no liability" absent the condition. *Id.*

■ The focus of this appeal is the existence of the first condition: whether the government approved reasonably precise specifications. To delineate the boundaries of government approval that satisfies this condition, other circuits have drawn a distinction between sufficient approval and a mere "rubber stamp." *Lewis v. Babcock Indus., Inc.*, 985 F.2d 83, 87 (2d Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 3041, 125 L.Ed.2d 727 (1993); *Maguire v. Hughes Aircraft Corp.*, 912 F.2d 67, 72 (3d Cir.1990); *Ramey v. Martin–Baker Aircraft Co.*, 874 F.2d 946, 950 (4th Cir.1989); *Trevino v. General Dynamics Corp.*, 865 F.2d 1474, 1480 (5th Cir.), *cert. denied*, 493 U.S. 935, 110 S.Ct. 327, 107 L.Ed.2d 317 (1989); *see also In re Aircraft Crash Litig. Frederick, Md.*, 752 F.Supp. 1326, 1338 (S.D. Ohio 1990), *aff'd by unpubl. op. sub nom., Darling v. Boeing Co.*, No. 90–3902, 1991 WL 105753, 1991 U.S.App. LEXIS 13093 (6th Cir. June 18, 1991). As these cases recognize, the Court in *Boyle* established the government contractor defense in order to protect the government's FTCA exemption from suits in which the United States exercises discretion in selecting a military equipment design. 487 U.S. at 511, 108 S.Ct. at 2518. The government exercises no discretion when it simply approves a design with a rubber stamp, that is, approves a design without scrutiny. "When the government merely accepts, without any substantive review or evaluation, decisions made by a government contractor, then the contractor, not the government, is exercising discretion." *Trevino*, 865 F.2d at 1480. In a rubber stamp context, imposing state tort liability for a design defect does not frustrate the FTCA exemption protecting the government's "judgment that a particular feature of military equipment is necessary," *Boyle*, 487 U.S. at 512, 108 S.Ct. at 2518,

because the government made no judgment as to the particular feature. No federal interest "significantly conflicts" with state law, and thus displacement of state law is unwarranted.

It has been held that *Boyle*'s first condition is satisfied where the government and the contractor engage in a " 'continuous back and forth' " review process regarding the design in question. *Harduvel v. General Dynamics Corp.*, 878 F.2d 1311, 1320 (11th Cir.1989) (quoting *Koutsoubos v. Boeing Vertol*, 755 F.2d 352, 355 (3d Cir.), *cert. denied*, 474 U.S. 821, 106 S.Ct. 72, 88 L.Ed.2d 59 (1985)), *cert. denied*, 494 U.S. 1030, 110 S.Ct. 1479, 108 L.Ed.2d 615 (1990). In *Harduvel*, an Air Force officer was killed when the F–16 fighter plane he was flying crashed. The officer's survivors and estate sought recovery from the F–16's manufacturer, claiming that the electrical system design caused the system's wires to chafe against each other, which in turn caused the electrical system to malfunction. *Id.* at 1314. The court in *Harduvel* held that the manufacturer met the three *Boyle* conditions, entitling the manufacturer to the government contractor defense. *Id.* at 1322. As to the first condition, the Air Force started the design process by soliciting proposals from manufacturers. The Air Force then extensively reviewed the winning manufacturer's proposed aircraft design, and assigned a specific group of engineers to review the electrical system design. *Id.* at 1320. In addition, the Air Force evaluated designs in three formal reviews prior to production. *Id.* Even after production, the Air Force continued to review and approve designs. *Id.* Based on the Air Force's involvement, the court concluded that the manufacturer and the Air Force designed the electrical system cooperatively via a back and forth process. *Id.* at 1320–21.

In this case, the development of the tandem hooks began in 1969, when the Army ran a rudimentary test of tandem hooks on a CH–47B helicopter. In 1973, the Army again evaluated the possibility of using hooks in tandem. The Army outfitted two CH–47Cs with tandem hooks from a CH–53, a Navy helicopter. The CH–53 hooks were designed and made by Eastern–Rotorcraft,

the predecessor company to defendant Breeze–Eastern. In 1977, the Army, Boeing, and Breeze–Eastern agreed to begin designing a new tandem hook design. In an Army memorandum dated March 23, 1977, the Chief of the Systems Development and Quality Division reported to the United States Army Aviation Systems Command (AVS-COM) that the new CH–47 prototype, designated YCH–47D, would not use an "already qualified" hook system.

The prototype's development was pursued under a contract which called for a Critical Item Development Specification (CIDS) and a Source Drawing for the tandem hooks. On May 20, 1977, Boeing completed the CIDS, which detailed the mechanical and electronic aspects of the tandem hook system. Boeing's CIDS explained that the prototype helicopter would have hooks positioned forward, center, and aft, and, most importantly, that "[e]ach of the three hooks shall be installed with the load beam *facing forward.*" (Emphasis added.) Indeed, the CIDS explained that the fitting that mounted the tandem hooks to the airframe "shall incorporate provisions such that, in conjunction with the airframe support fitting, the hook *cannot* be installed with the load beam facing aft." (Emphasis added.) In addition, the CIDS indicated that the forward and aft hooks would swivel forty degrees in the longitudinal plane. Finally, the CIDS described the load beam's requirements and configuration by referring to Source Drawing 145ES102–1.

Army memoranda from several branches reveal a high level of interest in the CIDS, Source Drawing, and an upcoming Critical Design Review (CDR). These early June 1977 government memoranda made several changes to the CIDS and declared that the aspects detailed in the CIDS were otherwise "acceptable." The Army reviewers expressed particular interest in the Source Drawing, specifically asking to see the drawing, which was not completed until June 13, 1977. Also, one reviewer wished to know when the CDR was to be held; another noted that a CDR "is required upon completion of the design effort to review the entire External Cargo Hook System."

Before the Army held the CDR, Boeing completed the Source Drawing. The text accompanying the drawing again explained that the hooks would face forward and that the tandem hooks would swivel forty degrees longitudinally. The Source Drawing showed those swivel angles, as well as the load beam's curvature. On July 13, one month after the completion of the Source Drawing, the CDR was held. Apparently, some of the concerns raised by the earlier reviewers were addressed at the CDR. On July 29, the Army's Systems Development and Quality Division explained the resolution of those concerns and announced that Boeing "has successfully completed the requirements of a Critical Design Review." After the CDR, Boeing and Breeze–Eastern tested the prototype. The Army contracted for another CIDS, which was completed in 1980. As to the alleged design defects involved in the instant case, the CIDS did not change. Finally, in December 1981, the Army contracted with Boeing for manufacture of the modernized CH–47D. The contract incorporated the drawings that had been approved by the Army, including the 1980 CIDS. Also, the contract specifically required that engineering changes to the CH–47D would be initiated through Engineering Change Proposals (ECPs). According to the contract, if the Army did not respond to an ECP within a specified time period, which varied according to the type of proposed change, then Boeing was directed to assume that the ECP was denied. Although the tandem hooks appear to have changed over time, the changes apparently did not affect the design defects alleged by the plaintiffs; in any event, in 1985, the Army approved such changes "from an airworthiness and engineering point of view."

We think that, as a matter of law, the design process described above satisfies *Boyle*'s first condition as to the three design defects of which the plaintiffs complain. The Army, Boeing, and Breeze–Eastern engaged in a "back and forth" development of the tandem hooks. Most importantly, the Army closely reviewed Boeing's 1977 CIDS, which expressly stated that the tandem hooks would face forward and would pivot forty degrees longitudinally. In addition, the ea-

gerly-anticipated Source Drawing indicated the load beam's curvature shape. The Army's substantive scrutiny of the tandem hook design in the CDR convinces us that the Army did more than rubber stamp the design. Although a number of Army memoranda and documents in the record reflect no more than a single sentence, cursory review, and acceptance of some aspect of the tandem hook system, the initial face forward position of the hook and the forty degree longitudinal pivot of the load beam component were the subject of close scrutiny by the Army in the 1977 CIDS. As to those vital components of the hook's design, there was a back and forth dialogue culminating in approval by the Army. Accordingly, there is no genuine issue of material fact regarding the Army's approval, and the defendants have satisfied the first *Boyle* condition as a matter of law.

Moreover, the defendants have demonstrated that they are entitled to summary judgment as to the second and third *Boyle* conditions. The second condition is satisfied because the Army inspected and approved the CH–47D that crashed, and the plaintiffs point to no evidence that the aircraft failed to conform with the designs, production contracts, or specifications. Finally, the Army was aware of all the dangers of which the contractors were aware. In September 1977, the Army itself tested tandem hooks attached to a YCH–47C/D, and concluded that cargo should be loaded "so that tension is maintained on the aft hook which facilitates releasing the load." In November 1977, Boeing presented the Army with a Hazard Analysis that warned that the cargo might not release if it dragged on the ground. Also, the Army's 1982 CH–47D manual warned that "[t]he forward and aft hooks may fail to open if the slings are slack when the release solenoids are energized (a load of 18 to 22 pounds is required for opening)." The manual also explained how a pilot might successfully release the cargo if a first attempt failed due to sling slack. Hence, the third condition of *Boyle* has been met. Consequently, the defendants are entitled to summary judgment as to the design defect claim.

## III.

 The plaintiffs also allege that the defendants failed to adequately warn the crew members of the dangers associated with use of the tandem hook system. The district court dismissed the entire case without addressing this claim, holding only that the government contractor defense shielded the defendants from liability for the alleged design defects. On appeal, the plaintiffs argue that the district court erred by assuming, apparently, that the failure to warn claim must fail simply because the defendants won summary judgment as to the design defect claim.

We agree that the defendants' success in establishing the government contractor defense against the design defect claim does not by itself establish a defense to the plaintiffs' failure to warn claim. Several of our sister circuits have applied the government contractor defense against failure to warn claims; those cases do not focus on the underlying design defects, but instead focus on the *warnings*. *In re Hawaii Fed. Asbestos Cases,* 960 F.2d 806, 812–13 (9th Cir.1992) (dictum); *Dorse v. Eagle–Picher Indus., Inc.,* 898 F.2d 1487, 1489 (11th Cir.1990); *In re Joint E. & S. Dist. N.Y. Asbestos Litig.,* 897 F.2d 626, 632–33 (2d Cir.1990). Warning the government of dangers arising from a specific design—the third condition of *Boyle*—does not encompass or state a failure to warn claim; it simply encourages contractors to provide the government with all the information required to soundly exercise its discretion. "By contrast, tort law duties to warn accomplish an entirely different objective of helping those who use or otherwise come into contact with a product to protect their own safety." *In re N.Y. Asbestos,* 897 F.2d at 632. In the government contractor defense context, design defect and failure to warn claims differ practically as well as theoretically. Simply because the government exercises discretion in approving a design does not mean that the government considered the appropriate warnings, if any, that should accompany the product. This is especially true with regard to military equipment procurement where complex judgments by representatives of the Armed Forces often in-

volve "balancing of many technical, military, and even social considerations." *Boyle,* 487 U.S. at 511, 108 S.Ct. at 2518. We hold that the government contractor defense is not necessarily established merely by satisfying the government contractor defense conditions as to design defect claims.

Although the rule announced in *Boyle* applies only to design claims, and the government contractor defense as applied against failure to warn claims is independent of design defect claims, *Boyle* provides guidance in determining when state law governing a failure to warn claim can be displaced. The *Boyle* Court explained that the government contractor defense displaces state law when imposing state tort liability "significant[ly] conflict[s]" with a federal interest. *Id.* at 507, 108 S.Ct. at 2516. As we have seen, there is a federal interest in protecting the government's FTCA exemption for discretionary functions. When the government exercises its discretion and approves designs prepared by private contractors, it has an interest in insulating its contractors from liability for such design defects. *Id.* at 511–12, 108 S.Ct. at 2518–19. Similarly, when the government exercises its discretion and approves warnings intended for users, it has an interest in insulating its contractors from state failure to warn tort liability.

■ Accordingly, the rationale for applying the government contractor defense to a failure to warn claim tracks the *Boyle* analysis closely. When state law would otherwise impose liability for a failure to warn of dangers in using military equipment, that law is displaced if the contractor can show: (1) the United States exercised its discretion and approved the warnings, if any; (2) the contractor provided warnings that conformed to the approved warnings; and (3) the contractor warned the United States of the dangers in the equipment's use about which the contractor knew, but the United States did not. As in design defect cases, in order to satisfy the first condition—government "approval"—in failure to warn cases, the government's involvement must transcend rubber stamping. And where the government goes beyond approval and actually determines for itself the warnings to be provided, the con-

tractor has surely satisfied the first condition because the government exercised its discretion. The second condition in failure to warn cases, as in design defect cases, assures that the defense protects the government's, not the contractor's, exercise of discretion. Finally, the third condition encourages frank communication to the government of the equipment's dangers and increases the likelihood that the government will make a well-informed judgment. Since none of this analysis was undertaken by the district court, we must remand.

■ In the interests of guiding the district court upon remand, we note that some of the cases decided in other circuits applying the government contractor defense to failure to warn claims may require a higher level of government involvement than we think is required. *See Dorse,* 898 F.2d at 1489; *In re N.Y. Asbestos,* 897 F.2d at 630. Several of the cases decided in our sister circuits indicate that the contractor must show "that the Government itself 'dictated' the content of the warnings," *In re N.Y. Asbestos,* 897 F.2d at 630 (quoting *Nicholson v. United Technologies Corp.,* 697 F.Supp. 598, 604 (D.Conn. 1988)), or that the United States imposed a "prohibition against health warnings," *Dorse,* 898 F.2d at 1489. We reiterate that the FTCA's discretionary function exemption delineates the contours of the defense. Government *discretion* is required, not dictation or prohibition of warnings. Where a contractor proposes warnings that the government substantively approves, and satisfies the second and third conditions, the defense displaces state law—even if the government did not "prohibit" the contractor from proposing more alarming warnings.

Here, the district court did not decide whether a genuine issue of material fact exists regarding the applicability of the government contractor defense as applied to the failure to warn claim. Indeed, there has been no determination that Kentucky tort law imposes a duty to warn under the facts of this case. Upon remand, the district court may elect to assume *arguendo* that Kentucky law would impose liability under these facts, and proceed to determine the propriety of summary judgment based on the government

contractor defense. Finally, we recognize that the parties might have developed an insufficient record on the failure to warn claim. Accordingly, we vacate the district court's dismissal of the failure to warn claim, and remand for further proceedings.

## IV.

The plaintiffs' final contention is that the district court erred by denying their motion to strike exhibits offered by Boeing. In support of its summary judgment motion, Boeing attached Army memoranda to a supplemental declaration filed with the district court. The plaintiffs assert that Boeing should have produced these documents earlier in discovery, and that Boeing's discovery violation should render the documents inadmissible. Boeing claims that the memoranda were obtained only after Boeing received the Army's response to a Freedom of Information Act request, and that the memoranda were turned over soon thereafter.

Boeing filed the supplemental declaration on February 4, 1993, only twelve days before the summary judgment arguments were to be heard. However, the district court continued the arguments to March 25. Indeed, after the March 25 arguments, the district court granted the plaintiffs until April 9 to submit whatever additional memoranda of law or exhibits that the plaintiffs wished to file. The plaintiffs had sufficient time either to respond to Boeing's new discovery materials or show that additional time would provide fruitful results. The district court did not abuse its discretion, *see Theunissen v. Matthews,* 935 F.2d 1454, 1465 (6th Cir.1991), in accepting Boeing's discovery materials.

## V.

For the foregoing reasons, we **AFFIRM** the district court's entry of summary judgment in favor of the defendants as to the design defect claim. We **VACATE** the district court's entry of summary judgment in favor of the defendants as to the failure to warn claim and **REMAND** for further pro-

ceedings. Finally, we **AFFIRM** the district court's refusal to strike Boeing's discovery.