Gloria FAGANS, et al., Plaintiffs,

v.

UNISYS CORPORATION, successor to Burroughs Corp., Defendant.

Civil A. No. 95–1062 (JLG).

United States District Court, District of Columbia.

Nov. 12, 1996.

Bardyl R. Tirana, Washington, DC, Marc P. Weingarten, Gretzer and Locks, Philadelphia, PA, for Plaintiffs.

Kevin Michael Murphy, Jan Ellen Simonsen, Carr, Goodson & Lee, Washington, DC, for Defendant.

## MEMORANDUM

JUNE L. GREEN, District Judge.

This matter is before the Court on Defendant Unisys Corporation's ("Unisys") Motion for Summary Judgment. As grounds, Unisys states that the government contractor defense is applicable and serves as a complete defense to all of Plaintiffs' claims. The Court agrees and grants Unisys's motion.

## I. BACKGROUND

This cause of action, originally part of a multiparty case brought in the United States District Court for the Eastern District of New York, was severed and transferred to this Court pursuant to Fed.R.Civ.P. 21 and 28 U.S.C. § 1404(a) on May 27, 1994.

The underlying claims in this case involve the so-called "repetitive stress injuries" ("RSI") that allegedly result from long-term, constant use of certain keyboard equipment. Plaintiffs Gloria Fagans and Johnette Cox were employed as letter sorters for the United States Postal Service ("Postal Service").[1] While so employed, each used a device known as the Multi–Positional Letter Sorting Machine ("MPLSM"). Each complains of RSI injury allegedly resulting from use of this equipment.

Plaintiffs allege that Unisys is liable because the keyboard portion of the MPLSM, which it manufactured, allegedly is defective and Unisys failed to warn of this condition. Each cause of action is grounded in theories of negligence and strict liability. (See Compl.)

Defendant contends that, as a government contractor, it is not liable to Plaintiffs because it meets the elements of the "government contractor defense" set forth in Boyle v. United Technologies Corp., 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988).

## II. MATERIAL FACTS

The following are material facts as to which there is no genuine issue or dispute:

1. In 1956 the Postal Service initiated the design and development of the MPLSM through a National Bureau of Standards contract with Rabinow Engineering Company ("Rabinow"). (Def.Stat.Facts ¶ 2.)

2. Rabinow designed and built a full-scale pilot model of the MPLSM which was installed in the United States Postal Laboratory in Washington, D.C. for examination, testing and analysis by Postal Service engineers and technicians. (Def.Stat.Facts ¶¶ 3 and 68.)

3. The Postal Service made several modifications to the Rabinow design, including repositioning of the keyboard. Thereafter, the Postal Service awarded a contract to build ten prototypes of the Rabinow MPLSM design to Burroughs in 1958.[2] (Def.Stat.Facts ¶¶ 5 and 6.)

4. To perform this contract, the Postal Service provided Burroughs with the Rabinow design drawings and specifications, including those for the keyboard design. (Def.Stat.Facts ¶ 7.)

5. Under the prototype contract, the fundamental design of the MPLSM did not change from the Rabinow model and the first of the prototypes was delivered to the Postal Service in 1959. (Def.Stat.Facts ¶ 10.)

6. The Postal Service inspected each MPLSM against inspection criteria developed by the Postal Laboratory and the Postal Service's human factors engineers. The Postal Service subsequently accepted all ten prototypes as conforming in all material respects to the Postal Service's requirements. (Def.Stat.Facts ¶ 11 and 12.)

7. In 1963, after four years of review and evaluation of the prototypes, including human factors analyses, the Postal Service developed and drafted a comprehensive set of detailed production drawings and specifications for the MPLSM, including the keyboard and speed control specifications. The Postal Service specifications and drawings detailed every aspect of the MPLSM, including tolerances; design and materials for the MPLSM keyboard; shape, tension, triggering pressure, and stroke distance of the keys;

---

1. The remaining Plaintiff, Josephus Fagans, is the husband of Gloria Fagans, and is suing for loss of consortium.

2. Unisys is the successor-in-interest to Burroughs and Sperry Corporation, which merged in 1987.

key spacing; key actuating pressure; and the range of operating speeds for the MPLSM. (Def.Stat.Facts ¶ 13.)

8. The detailed production drawings and specifications were used to competitively bid future contracts for the mass production of MPLSMs and in 1964, the Postal Service awarded Burroughs the contract to manufacture 26 MPLSMs pursuant to the Postal Service's "build-to-print" drawings and specifications. (Def.Stat.Facts ¶¶ 14 and 15.)

9. The Postal Service specifications also required numerous safety devices, and expressly limited Burroughs to providing only those safety items contained in the Postal Service specifications and drawings. Only the Postal Service could implement unilateral changes to the MPLSM design. (Def.Stat.Facts ¶ 18 and 20.)

10. Production commenced with regular inspections by the Postal Service and its on-site representative, the Defense Contract Administrative Service ("DCA"), to ensure conformance with the design specifications. Upon completion, but before shipment, the DCAS certified each subassembly as conforming to the specifications. (Def.Stat.Facts ¶¶ 28 and 29.)

11. Following final assembly of the MPLSM, the Postal Service conducted tests of the machine using Postal Service employees. Where non-conformities were discovered, adjustments were made and the Postal Service eventually accepted all MPLSMs and certified that they conformed in all material respects to the Postal Service specifications. (Def.Stat.Facts ¶¶ 32–34.)

12. Over the next twenty years Burroughs manufactured some 900 MPLSMs, including modified versions of the original MPLSM, under the same circumstances. (Def.Stat.Facts ¶¶ 39–67.)

13. The Postal Service was aware of operator stress and fatigue issues as early as the late 1960's or early 1970's and Burroughs' personnel became aware of such only after being informed by the Postal Service. (Def. Reply, Att. D and E.)

## III. DISCUSSION

### A. Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

Once the moving party identifies facts which, if uncontroverted, would entitle the movant to summary judgment, the burden shifts to the nonmoving party to come forward with specific material facts demonstrating that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–249, 106 S.Ct. 2505, 2509–2511, 91 L.Ed.2d 202 (1986). The party opposing the motion must go beyond the pleadings and provide affidavits or "depositions, answers to interrogatories, and admissions on file" in order to designate "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(e)). The Supreme Court in *Anderson* explained that a genuine issue of material fact is a "dispute over facts that might affect the outcome of the suit under the governing law...." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 106 S.Ct. at 2510.

In deciding a motion for summary judgment, the material before the Court "must be viewed in the light most favorable to the [nonmoving] party." *Adickes v. S.H. Kress and Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). Summary judgment will not lie if a reasonable jury could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 252, 106 S.Ct. at 2512.

### B. The Government Contractor Defense

Under *Boyle v. United Technologies Corp.*, 487 U.S. 500, 512, 108 S.Ct. 2510, 2518–2519, 101 L.Ed.2d 442 (1988), actions against government contractors are preempt-

ed where 1) the government approves "reasonably precise specifications;" 2) the allegedly defective equipment conformed to those specifications; and 3) the contractor warned the government about all dangers in the use of the equipment that were known to the contractor but not to the government.[3]

Reviewing the record in this case, it is clear to the Court that the Postal Service not only approved the design and specifications for the MPLSMs, but actually provided Burroughs with those specifications at the time it offered the contract for bidding. (Def.Stat.Facts ¶ 7.) Further, the Court finds that those specifications were precise and that the Postal Service required strict adherence to its specifications (including production of the keyboard) throughout manufacturing (Def.Stat.Facts ¶ 18 and 20.) The Postal Service controlled any modifications to the MPLSMs so much so that Burroughs could not make any unilateral changes. (Id.) The Postal Service enforced such restrictions through frequent on-site inspections during manufacturing and final assembly of the MPLSMs (Def.Stat.Facts ¶¶ 28 and 29.) Finally, approval of the MPLSMs, and their conformance to the design specifications, certainly occurred once the Postal Service inspected, certified and accepted the equipment for use. (Def.Stat.Facts ¶¶ 32–34.) The Court, therefore, concludes that the Defendant has satisfied the first two elements of the *Boyle* test.

As for the third element of the *Boyle* test, the Plaintiffs have provided no evidence that the Defendant failed to alert the Postal Service of any dangers known to the Defendant, but not known to the Postal Service, in the use of the MPLSM equipment. In fact, the Postal Service was in the best possible position to discover the kinds of hazards resulting in the injuries claimed by Plaintiffs. The Postal Service was responsible for testing and operating the machines (Def.Mtn., Ex. 4, ¶ 10.), and its employees, the MPLSM operators, would have had little contact with Burroughs personnel. In fact, it appears that Burroughs first learned of fatigue issues from reports by its field engineers who had heard informally that the postal worker's union had complained to the Postal Service of MPLSM operator complaints.[4] (*Id.*) Further, it was the Postal Service who had been conducting studies and evaluations of human factors concerning MPLSM operations since the late 1950's at its Postal Lab in Washington, D.C. (Def.Stat.Facts ¶ 68.)

### C. *"Failure to Warn Claims"*

The Plaintiff's argue that *Boyle* does not apply to "failure to warn" claims because there is no Postal Service specification for the MPLSM that precludes the issuance of warnings beyond those specified by the Postal Service. In addressing this issue, the Sixth Circuit, in *Tate v. Boeing Helicopters*, 55 F.3d 1150, 1156 (6th Cir.1996), held that the government contractor defense enunciated in *Boyle* is not by itself sufficient for deciding "failure to warn" claims. Instead, the court ruled that the defense would apply to such claims where: "1) the United States exercised its discretion and approved warnings, if any; 2) the contractor provided warnings that conformed to approved warnings; and, 3) the contractor warned the United States of dangers in the equipment's use about which the contractor knew but the United States did not." *Id.* at 1157. This Court agrees that this is the proper test.

Applying *Tate* to the facts here, it is apparent that the Postal Service provided specifications for all safety devices and required Burroughs to follow those specifications strictly.[5] (Def.Stat.Facts ¶¶ 18 and 20.)

---

**3.** Although *Boyle* involved military contracts, it has been extended to apply to civilian procurements. *Carley v. Wheeled Coach*, 991 F.2d 1117 (3rd Cir.), *cert. denied*, 510 U.S. 868, 114 S.Ct. 191, 126 L.Ed.2d 150 (1993).

**4.** By 1970, the United Federation of Postal Clerks was aware that operators had developed an "arthritic condition" after years of operating MPLSMs and recommended the addition of an arm rest as a remedy. (Def.Stat.Facts ¶ 76.)

**5.** *Safety Devices*—The [MPLSM] shall be furnished with suitable devices as required by the specifications and as shown on the drawings.... All special safety devices for prevention of damage of letter, for removal of letters deposited on top of or between carts because of improper insertion, and for protection of operators, and maintenance personnel shall be provided herein, or as shown on the drawings. Def.Mtn., Ex. 1, §§ 3.11.7.12.

Those specifications included the specific safety and warning devices to be incorporated into the MPLSMs. (*Id.*) While it is true that nothing would have prevented Burroughs from seeking the Postal Service's permission to add a warning label if a potential safety hazard was discovered, that is not the test under *Tate*. The government contractor defense was adopted in order to give government contractors protection from liability where the government exercises discretion. Here, that discretion went far beyond approving someone else's specifications. These were the Postal Service's own specifications and were so precise that they even included requirements for the size and placement of the manufacturer's name plate. (Def.Mtn., Ex. 1, ¶ 3.11.10 and 11.)

Accordingly, the Court concludes that the Postal Service exercised discretion concerning warnings and safety devices for the MPLSMs and that Burroughs complied with such specifications.[6] As a result, the Defendant falls within the protection of the government contractor defense with regard to Plaintiffs' "failure to warn" claims.

In reaching these issues, the Court notes that numerous other district courts across the country have made similar rulings on identical facts. Although to date, there have been no circuit decisions on those rulings, the Court gives some weight to the legal analyses contained in the district court opinions. *See Andrew v. Unisys Corp.*, 936 F.Supp. 821 (W.D.Okla.1996); *Russek v. Unisys Corp.*, 921 F.Supp. 1277 (D.N.J.1996); *Wisner v. Unisys Corp.*, 917 F.Supp. 1501 (D.Kan. 1996); *McCoy v. Unisys Corp.*, No. H-95-1487, U.S. Dist. LEXIS 4349, 1996 WL 186085 (S.D.Tex. Jan. 16, 1996); *Schmid v. Unisys Corp.*, No. 4:95CV00864 LOD, 1996 WL 421843 (E.D.Mo.1996).

## IV. CONCLUSION

Based upon the record in this case, the Court concludes that the Plaintiff has demonstrated facts sufficient to invoke the protection of the government contractor defense set forth by the Supreme Court in *Boyle*. Further, the Court finds that this defense

applies even to Plaintiffs' "failure to warn" claims. Accordingly, the Defendant has met its burden and is entitled to judgment as a matter of law. The Court, therefore, enters judgment for Defendant and dismisses this case with prejudice. An appropriate Order accompanies this Memorandum.

### ORDER

Upon consideration of Defendant Unisys Corporations's Motion for Summary Judgment; the opposition and reply thereto; the several supplemental memoranda filed by Defendant; the entire record herein, and for the reasons stated in the accompanying memorandum of law, it is by the Court this 12th day of November 1996,

**ORDERED** that Defendant's motion is **GRANTED** and judgment is entered for Defendant; it is further

**ORDERED** that this case is **DISMISSED** with prejudice.

6. The third prong of the *Tate* analysis appears to be identical to that in the *Boyle* test and so the Court defers to its previous discussion on that issue.