Andrew HALTIWANGER, Plaintiff,

v.

UNISYS CORPORATION, Defendant.

Civil Action No. 95–1024 SSH.

United States District Court,
District of Columbia.

Dec. 18, 1996.

Bardyl R. Tirana, Washington, DC, Steven J. Philips, Levy, Phillips & Konigsberg, New York City, Marc P. Weingarten, Greitzer & Locks, Philadelphia, PA, for plaintiff Haltiwanger.

Kevin Michael Murphy, Jan Ellen Simonsen, Carr, Goodson, Lee & Warner, P.C., Washington, DC, Jeffrey L. Chase, Herzfeld & Rubin, P.C., New York City, for defendant Unisys Corp.

## OPINION

STANLEY S. HARRIS, District Judge.

Before the Court is defendant's motion for summary judgment, plaintiff's opposition and defendant's reply. Upon careful consideration of the record, defendant's motion for summary judgment is granted. Although "[f]indings of fact and conclusions of law are unnecessary on decisions of motions under Rules 12 or 56," Fed.R.Civ.Pro. 52(a), the Court nonetheless sets forth its reasoning.

## BACKGROUND FACTS

Plaintiff, Andrew Haltiwanger, has been employed as a clerk with the United States Postal Service (the "Postal Service") from 1980 to the present, during which time he operated a multiple position letter sorter machine (the "MPLSM"). He currently suffers from repetitive stress injuries, including bilateral carpal tunnel syndrome. Defendant Unisys Corporation is the successor-in-interest of the Burroughs Corporation, which has assisted in the design and manufacture of the MPLSM since its creation.

The MPLSM is an automatic letter-sorter machine which is 77 feet long and 9 feet high, consisting of twelve consoles where Postal Service operators use two ten-key, piano-style keyboards arranged in two tiers. As mail is mechanically conveyed past the operator console, the operator reads the zip code and enters a code on the keyboards. The MPLSM then directs the letter to the appropriate sorting bin located on the other side of the machine.

The original design for the MPLSM was initiated in 1956 by the Rabinow Engineering Company ("Rabinow"). The Postal Service slightly altered the original design and contracted with the Burroughs Corporation ("Burroughs") to build ten prototypes of the Rabinow design, which were installed in Michigan and Washington, D.C. The Postal Service then awarded Burroughs a contract to manufacture MPLSMs that were based on four separate sets of specifications and drawings that had been developed over the years—the 1970 Model 120/121, the 1974 Model 140/141 with Electronic Sort Processor (ESP), the 1974 Model 140/141 with Zip Mail Translator (ZMT), and the 1976 version of the machine.

Each adaptation of the design was accompanied by an extensive volume of specifications and procedures that Burroughs was required to follow. The original specifications devoted several sections to the components of the machine related to possible repetitive stress injury, including the operator console, the console keyboards, the key pressure adjustment control, the operator chair and the sorting rates. Extensive descriptions of the machinery were sustained in subsequent variations of the design, and were accompanied by detailed drawings of the proposed keyboard and its features. The guidelines also included precise stipulations regarding the proper materials and workmanship, as well as the necessary safety devices and provisions. Notably, the Postal Service specifically dictated that any element of the manufacturing process or product that "differ[s] in the slightest detail from those specified or shown on the drawings shall be subject to approval by the Postal Service," MPLSM Model 120/121 Specifications ("Spec.") § 3.14. It further was provided:

Should any questions arise after award of the contract, concerning the exact meaning of the specification and drawings, the contractor shall provide immediate written notice to the Contracting Officer requesting clarification. The contractor shall not proceed with work on which questions have arisen. Work shall proceed only after

written notification by the Contracting Officer of resolution of the questions. MPLSM Model 120/121 Spec. § 3.12.7. An extensive nine-page "Engineering Change Procedure" existed as a means by which to implement "[a]ll changes relative to engineering documentation." Def.'s Mot. for Summ. J., Ex. 13 at 1.

Throughout the course of production of each model, there was continuous discussion and cooperation between the Postal Service and Burroughs, exchanging design ideas and possible improvements for the MPLSM. Despite some reciprocity, however, suggestions from Burroughs employees were always subject to the Postal Service's approval. Although Burroughs participated throughout the design process, the ultimate interpretive decision-making power was consistently and exclusively under Postal Service control. The Postal Service evaluated each potential change, specifically accepting those that were ultimately incorporated into the final design. *See* Def.'s Mot. for Summ. J., Ex. 13 at 5.

At each stage of development, extensive testing and inspection was conducted by the Postal Service to ensure that the machines were consistent with its specifications and drawings. An initial test prior to production entailed a physical and functional inspection of the MPLSM to guarantee conformity with the Postal Service requirements in all material respects. The Postal Service and the Defense Contract Administrative Service ("DCAS") continued on-site, in-process inspections throughout manufacturing, and "live mail" tests of the machine were executed after assembly over the course of a regular work shift to verify that operation followed the Postal Service specifications.

Over the years, studies and analyses of the human factors associated with the MPLSM were conducted by both the Postal Service and Burroughs. In the early 1960's, the Postal Service employed human factors engineers and operated a Bureau of Research and Engineering that studied the interaction between the MPLSM and its operator. Throughout the development of the MPLSM, the Postal Service expanded its work in human factors issues to include a five-year human research and development plan, addressing concerns such as fatigue reduction, keyboard design, and pacing of MPLSM work. *See* Def.'s Mot. for Summ. J., Ex. 21. Although many early analyses were inconclusive with respect to the potential danger of the MPLSM, there was a growing awareness of the relevant issues and possible negative impacts of the machine's operation. Links were soon discovered between automatic sorting machines and repetitive stress injuries, including carpal tunnel syndrome, and a number of the later studies demonstrated direct harm caused by the machines. *See* Def.'s Mot. for Summ. J., Exs. 35, 36, 38. While many of those studies were conducted by other agencies and interest groups, several of the reports were sponsored by divisions of the Postal Service or supported by the assistance of individuals within the Postal Service. *See* Def.'s Mot. for Summ. J., Exs. 35, 36.

## ANALYSIS

Summary judgment is to be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether summary judgment is appropriate, all evidence and inferences must be construed in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–88, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). If a reasonable jury could return a verdict for the non-moving party based on the record, summary judgment may not be granted. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–49, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Differences of opinion on details not directly relevant to the legal issue at hand are not sufficient to preclude summary judgment—the non-moving party must present genuine issues of material fact in the context of the present case. *Harding v. Gray*, 9 F.3d 150, 154 (D.C.Cir.1993).

### I.  The Boyle Standard

Plaintiff charges that defendant is responsible for the flaws in the MPLSM design that

caused repetitive stress injuries among Postal Service employees who operated the machines. Defendant contends that the government contractor defense applies, arguing that as a result of its contract with the Postal Service, it shares the government's immunity from such lawsuits.

■ The accepted standard for determining whether governmental immunity extends to government contractors was established by *Boyle v. United Technologies Corp.*, 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988). *Boyle* extends the discretionary function exception of the Federal Tort Claims Act (the "FTCA") to include contractors working for the government, thus providing immunity against claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government." 28 U.S.C. § 2680(a). When a contractor acts to implement a discretionary decision made by the government, the defense applies. The *Boyle* court held that the common law government contractor defense supplants state tort law when there is a clear conflict between the two and a strong federal interest is implicated. The Court reasoned that immunity for government contractors serves the same ultimate purpose as FTCA government immunity—it alleviates the burden of potential lawsuits when issues of national importance are at stake. The defense prevents related liability costs from inevitably being passed to and borne by the government, since contractors will "predictably raise their prices to cover, or to insure against, contingent liability for the Government-ordered designs." *Boyle*, 487 U.S. at 512, 108 S.Ct. at 2518.

■ *Boyle* established standards by which to determine whether the government contractor defense applies to a given case: (1) the United States must approve reasonably precise specifications; (2) the equipment must conform to those specifications; and (3) the supplier must warn the United States about known dangers arising from use of the equipment. The first two requirements determine whether the suit is actually within the discretionary function exception, evaluating whether the contractor does in fact implement the government's discretion. The third criterion aims to preclude abuse of the defense, eliminating the incentive to withhold important information that could potentially disrupt the contract, since withholding it would incur no liability for the contractor. *Boyle*, 487 U.S. at 512, 108 S.Ct. at 2518.

The three *Boyle* standards—approval, conformance, and relative knowledge—form the substantive basis of the government contractor defense. Plaintiff contends that defendant does not satisfy the requirements of the defense. The Court concludes that the defense applies and grants summary judgment to defendant.[1]

### A. *Approval*

*Boyle* requires that the government agency approve "reasonably precise" specifications to demonstrate that the contractor has implemented the government's discretion. It is therefore necessary to define "reasonably precise," deciding whether the Postal Service must specifically design and approve every detail of each MPLSM feature, or whether general acceptance of an overall design constitutes "approval" for purposes of the discretionary function exception.

■ The law indicates that general government approval of an overall design is sufficient, and the defense can apply even where the manufacturer retains significant control over the design features in question. *Carley v. Wheeled Coach*, 991 F.2d 1117, 1125 (3d Cir.1993). The government need not actually participate in the process of design at all—simple approval of a manufacturer's de-

---

1. The Court grants summary judgment based on the relevant legal standards and the government contractor defense. The Court observes that a number of courts throughout the country have recently granted summary judgment given identical facts regarding the MPLSM and repetitive stress injury. *See Houghtaling v. Unisys Corp.*, No. 94–2344 (JCL), —— F.Supp. —— [1996 WL 794142] (D.N.J. Aug. 7, 1996); *Schmid v. Unisys Corp.*, No. 4:95CV00864 LOD (E.D.Mo. June 5, 1996); *Andrews v. Unisys Corp.*, No. Civ–95–608–R (W.D.Okla. May 7, 1996); *Wisner v. Unisys Corp.*, 917 F.Supp. 1501 (D.Kan.1996); *McCoy v. Unisys Corp.*, No. H–95–1487, 1996 WL 186085, U.S.Dist. LEXIS 4349 (S.D.Tex. Jan. 16, 1996).

sign is acceptable. "[T]he first government contractor defense criterion is met by a showing of government approval of the overall design. It is not necessary that there be 'continuous back and forth discussions ... regarding the inclusion or exclusion of the specific design deficiency.'" *Maguire v. Hughes Aircraft Corp.*, 725 F.Supp. 821, 823–24 (D.N.J.1989) (quoting *Wilson v. Boeing Co.*, 655 F.Supp. 766, 773 (E.D.Pa.1987)); *see also Stout v. Borg–Warner Corp.*, 933 F.2d 331 (5th Cir.1991). While approval is more likely to be established when the government is involved in design and development, the agency need not dictate any particular design specifications, and only approval after the fact is required. *See Kleemann v. McDonnell Douglas Corp.*, 890 F.2d 698, 701 (4th Cir.1989); *Dowd v. Textron, Inc.*, 792 F.2d 409, 412 (4th Cir.1986).

■ Plaintiff contends that the "reasonably precise" standard in *Boyle* refers to the aspect of the machine that was defective, and requires that the government have discretion over that particular feature. *See Bailey v. McDonnell Douglas Corp.*, 989 F.2d 794, 799 (5th Cir.1993). It is unclear, however, how precise plaintiff contends the specifications regarding that particular feature must be. The government may generally describe a keyboard design without necessarily designating each minor aspect of the keyboard, thus exercising discretion over the basic keyboard design without specifying every last detail in question. Similarly, plaintiff contends that simple "rubber stamp" approval does not constitute approval under the *Boyle* standard, and that "substantive review" must precede acceptance of a design. *Trevino v. Gen. Dynamics Corp.*, 865 F.2d 1474, 1480 (5th Cir.1989); *see also Lewis v. Babcock Indus., Inc.*, 985 F.2d 83, 87 (2d Cir.1993). Plaintiff misunderstands, however, what "substantive review" entails as an element of approval. A substantive review does not require government participation in the decision making or design pro-

cesses, as long as the manufacturer's ultimate decisions are evaluated with sufficient care.[2] While blind acceptance of a design does not constitute sufficient government discretion, only government review and approval of the specifications is required by the case law, and acceptance after genuine consideration and informed judgment satisfies the first prong of *Boyle*. *See Trevino*, 865 F.2d at 1483–84.

■ Defendant in the present case has satisfied the approval prong of the *Boyle* test even under the most stringent interpretation, which requires that the Postal Service participate in and create the MPLSM design. The detailed design specifications provided by the Postal Service for the MPLSM exceed the minimum requirement of the general approval of "reasonably precise" specifications. The four sets of specifications formulated by the Postal Service included descriptions of the keyboard configuration, key pressure adjustment control, letter sorting rate, speed control, and operator's console, and were accompanied by detailed drawings and diagrams. *See* Def.'s Mot. for Summ. J., Ex. 1 at 3–5—3–11. This information is contained in the affidavits of former employees of both Burroughs and the Postal Service, and is supported by the written record and the original documents used by the Postal Service in the development of the MPLSMs. In fact, not only did the Postal Service approve relatively detailed specifications, but it actually created those provisions, thus proving that government discretion was actually exercised. The back-and-forth nature of the relationship between Burroughs and the Postal Service throughout the design and manufacturing processes reflects the consistent role that the Postal Service played in devising the final specifications for the MPLSM. The approval of reasonably precise specifications encompasses the ongoing development of the design, not simply the original set of drawings. *See Kleemann*, 890 F.2d at 702. Although not every detail of the

---

**2.** "Substantive review" is consistent with the general overall review that is the standard for approval under *Boyle*. "Substantive review" does not demand that each specific feature of the design be explicitly dictated by the government, as plaintiff suggests; rather, it requires only that

the government genuinely evaluate the content of the design. A general evaluation of the substance of the overall design is sufficient, and specific approval of each aspect of the design is unnecessary.

design originated with the Postal Service, the Postal Service actively participated in the evolution of the final product from the initial Rabinow plans introduced in the 1950's. The generally detailed specifications regarding the keyboard and console, as well as the requirement that any minor changes be submitted to the Postal Service for acceptance, illustrate the consistent control and discretion of the Postal Service over every aspect of the design and manufacturing processes. Defendant followed exceedingly detailed specifications that, even if not necessarily designed by the Postal Service, were submitted to a complicated substantive review by the Postal Service, undergoing intense scrutiny before being approved as a part of the final design.

■ Moreover, long-term use of a given design often indicates de facto acceptance of the design and thus constitutes approval for purposes of the *Boyle* test. The continued and consistent use of a product without grievances or modifications implies endorsement of the design and consent as to its production and operation. In *Dowd v. Textron, Inc.*, the court held that "length and breadth of the Army's experience with the 540 rotor system—and its decision to continue using it—amply establish government approval of the alleged design defects." *Dowd,* 792 F.2d at 412; *see also Ramey v. Martin–Baker Aircraft Co.*, 874 F.2d 946 (4th Cir. 1989). The Postal Service has used the MPLSM as manufactured by Burroughs consistently for more than 20 years without any problems or objections based on Burroughs's role in the design process. Even if the Postal Service's specifications had been broadly constructed and Burroughs had substituted its own judgment to complete the design, the Postal Service's extended use of the final product manifests its substantive acceptance and approval of the basic design and its specific features, thus satisfying the first prong of the *Boyle* test regardless of the nature of the Postal Service specifications.

There is thus no question of material fact with respect to the "approval" requirement of the *Boyle* test. The law delineates the contours of approval under the *Boyle* standard. Defendant has established approval based on the facts in the written record and documents, regardless of the parties' divergent interpretation of those facts.

### B. *Conformance*

The second part of the *Boyle* test ensures that a defendant has actually implemented the discretion of its government counterpart. It requires that the manufacturer's final product actually conform to the reasonably precise specifications initially provided by the government agency. In this case, plaintiff has conceded that defendant conformed to the specifications provided by the Postal Service. Pl.'s Opp. to Summ. J. at 2.

### C. *Relative Knowledge*

■ The third prong of the *Boyle* test requires that the contractor had "warned the United States about the dangers in the use of the equipment that were known to the [contractor] but not to the United States." *Boyle,* 487 U.S. at 512, 108 S.Ct. at 2518. The contractor is thus bound only to disclose information about which it is more knowledgeable than the government. Proving either that the contractor lacked actual knowledge of the danger or that the government was independently aware of the defect demonstrates that the government was at least as aware as the contractor. *See In re Aircraft Crash Litig.*, 752 F.Supp. 1326, 1339 (S.D.Ohio 1990); *Niemann v. McDonnell Douglas Corp.*, 721 F.Supp. 1019, 1028 (S.D.Ill.1989). If the government was already independently aware of a risk and chose to act regardless of that knowledge, defendant may still employ the government contractor defense without further warning the government. *See Stout v. Borg–Warner Corp.*, 933 F.2d 331, 336–37 (5th Cir.1991).

■ Plaintiff argues that defendant did not inform the Postal Service about potential dangers arising from the MPLSM and that the government contractor defense therefore cannot be used because the government was not operating with complete knowledge. However, defendant was not fully aware of the potential danger. Moreover, the Postal Service was independently aware of the information defendant did in fact know. Ten documents dating from 1963 and originating

with the Postal Service discuss human engineering factors that relate to the operation of the MPLSM and potential problems in that area. While these evaluations do not draw specific conclusions regarding the danger of the MPLSM and repetitive stress injuries, they show the Postal Service's awareness of the relevant issues with respect to human factors. Several studies supported or endorsed by Postal Service employees in the early 1980's proposed a correlation between the MPLSM and repetitive stress injuries. While they do not directly involve official Postal Service efforts, the extensive involvement of the postal workers and their primary union makes it unlikely that the Postal Service administration and officials would not be aware of the studies and their outcomes. Even without knowledge of the early studies, however, the Postal Service was aware of some risk of injury in 1983, after receiving a letter in July from Dr. Dean J. Seibert, the Postal Service's Area Medical Officer in Portland, Maine, attributing cumulative trauma disorder to excessive keying. See Def.'s Mot. for Summ. J., Ex. 37.[3] In 1984, Congressional hearings were held on the "Effects of Carpal Tunnel Syndrome and Tendonitis on Postal Employees," at which several Postal Service representatives testified. See Def.'s Mot. for Summ. J., Ex. 33. The Postal Service was thus aware of the available information at that point as it was presented at the hearings, and there is no indication that defendant knew or should have known more than what was revealed during the hearings. Following the hearings, the Postal Service would more likely have been aware of any new information, which consisted primarily of public material such as pamphlets and newspaper articles, some of which were produced by the American Postal Workers' Union and others within the Postal Service, as such information was directly relevant to a vital aspect of the Postal Service's daily operations.

Just as long-term use implies acceptance and approval of a design, it also suggests an understanding of the machinery and awareness of all the implications of its operation. Regardless of articles and studies regarding the machinery, actual, real-world use of the equipment is the best means by which to truly understand its nature as well as its shortcomings. Acceptance and continued use of a product, especially where the government agency participated in the design process, reflects a cognizance of any risks involved. See Galik v. Lockheed Shipbuilding Co., 727 F.Supp. 1433, 1437 (S.D.Ala. 1989). Using equipment for four years, the government "would have become aware of any limitations or dangers associated with . . . use." Zinck v. ITT Corp., 690 F.Supp. 1331, 1337 (S.D.N.Y.1988); see also Harduvel v. Gen. Dynamics Corp., 878 F.2d 1311 (11th Cir.1989). The government would be particularly aware of dangerous precedent where problems have arisen during prior use. See In re Air Crash Disaster at Mannheim, 769 F.2d 115, 124 (3d Cir.1985). After 30 years of continuous use and experience with the machine, the Postal Service was in the best position to recognize and remedy any dangers associated with its design. After production, the Postal Service retained exclusive control of employee training and the continued operation of the MPLSMs, and conducted extensive research efforts with respect to human factors issues and the MPLSM. Only the Postal Service, overseeing its workers on a daily basis and carefully monitoring the machine's effects, could fully understand the long-term impact of the apparatus. There is no question of fact regarding the Postal Service's continued and consistent use of the MPLSM over the years. The record demonstrates that the Postal Service was as well informed, if not more so, than defendant. Defendant was thus not bound to disclose any information to the Postal Service regarding the MPLSM or repetitive stress injuries in order to employ the government contractor defense.

## II. The Failure To Warn Claim

■■■ Plaintiff argues that defendant violated state law requiring warning labels concerning the potential dangers of using the MPLSMs. Defendant contends that the government contractor defense applies to the

---

**3.** Such knowledge in 1983 put the Postal Service in the same position that it claimed Burroughs was in at that time. See Pl.'s Opp. to Summ. J., Ex. D.

failure to warn claim as well, noting that the government exercised its discretion regarding the placement of warning labels, and defendant was thus bound to follow the government's decisions. The *Boyle* standard applies to failure to warn claims in certain instances, "provid[ing] guidance in determining when state law governing a failure to warn claim can be displaced." *Tate v. Boeing Helicopters*, 55 F.3d 1150, 1157 (6th Cir. 1995); *see also In re Hawaii Fed. Asbestos Cases*, 960 F.2d 806 (9th Cir.1992); *Dorse v. Eagle–Picher Indus. Inc.*, 898 F.2d 1487, 1489 (11th Cir.1990); *In re Joint E. and S. Dist. N.Y. Asbestos Litig.*, 897 F.2d 626, 629 (2d Cir.1990).

Plaintiff suggests that the *Boyle* test should be applied to failure to warn claims stringently, compelling defendant to show that the warnings were specifically mandated or prohibited by the terms of the government contract. Plaintiff argues that there must be a genuine conflict between the state duty to warn and the provisions of the government contract, such that defendant cannot unilaterally add warnings or safety features without contravening the terms of the contract. *Dorse*, 898 F.2d at 1490. Under this view, in order to use the government contractor defense, the government must dictate the specific content of the warnings to be posted. *In re Joint E. and S. Dist. N.Y.*, 897 F.2d at 630. Plaintiff argues that defendant's inability to use additional warnings must be explicitly denoted in the government contract in a way that specifically limits the contractor's ability to accommodate safety in another way. *In re Hawaii Fed. Asbestos Cases*, 960 F.2d at 813.

■ While plaintiff's theory finds support in some jurisdictions, the recent holding of the Sixth Circuit specifically challenges those findings, setting a new precedent by which failure to warn cases are to be evaluated. In *Tate v. Boeing Helicopters*, 55 F.3d 1150 (6th Cir.1995), the court held that, in order to apply the government contractor defense to a failure to warn claim, defendant need only demonstrate government discretion and general approval of the warning, and that the government agency need not dictate or specifically prohibit the warnings. *Tate* applies the three prongs of the *Boyle* test to the warning issue in the same manner in which it is used in design defect cases, noting that "the rationale for applying the government contractor defense to a failure to warn claim tracks the *Boyle* analysis closely." *Id.* at 1157. *Tate* recalls that the *Boyle* defense was originally based on the discretionary function exception of the FTCA; consequently, exercise of the government's discretion, rather than the specific dictation or prohibition of warnings, controls approval with respect to the failure to warn. As with design defect claims, government approval depends primarily on whether the government substantively reviews and approves the warnings. *Tate* specifically notes that prior cases, including *Dorse* and *In re New York Asbestos*, that insist that the government agency explicitly impose or prohibit specific warnings require too high a level of government involvement. *Tate*, 55 F.3d at 1157.

■ This Court is persuaded by, and follows, the court's analysis in *Tate*, and thus applies the *Boyle* test to plaintiff's failure to warn claim. Defendant satisfied its duty to warn obligation under *Tate*. Moreover, defendant satisfied the more stringent test proposed by plaintiff, which demands specific dictation or exclusion of warnings by the government. The original MPLSM specifications, which required explicit Postal Service approval of any deviations or modifications, apply to warnings as well as design features. The Postal Service provisions dictated the precise nature of the workmanship, materials, design, construction and assembly, providing a complete image of the final product encompassing its appearance as well as its safe and effective operation. Any label or warning not explicitly included in the specifications could be added only after an intensive, complicated procedure. Had the Postal Service wanted to include additional safety warnings, it would have done so as a part of its carefully crafted and detailed plans; it is not defendant's position to substitute its own judgment for that of the government. "When the government provides or approves specifications of a product which call for some safeguards but not others, the government contractor is not under a duty to pro-

vide every known safety device where it is not called for by the government contract." *Nicholson v. United Technologies Corp.,* 697 F.Supp. 598, 603 (D.Conn.1988). In the present case, the contract specifically forbids any deviation from the Postal Service plans without express prior approval and permission. It was explicit that any changes or adjustments which "differ in the slightest detail from those specified or shown on the drawings shall be subject to approval by the Postal Service." MPLSM Model 120/121 Spec. § 3.14. The very terms of defendant's contract with the Postal Service not only suggest but require deferral to the government's judgment regarding the design and manufacture of the MPLSM. Consequently, the contractor should not be liable for a defective design or absent label that was not dictated by the government.

The Court concludes that *Tate* provides the appropriate standard by which to evaluate the failure to warn claim, and the facts show that defendant satisfies that standard. The overall specifications that encompassed safety features and their corresponding warnings were developed and approved by the Postal Service. The final set of specifications and warnings was officially issued by the Postal Service after a rigorous substantive review in which every detail was carefully monitored and controlled by the Postal Service. The Postal Service's overall acceptance and approval of the specifications included approval of the warning labels and safety provisions, thus demonstrating the exercise of the government's discretion in selecting warnings as a part of the MPLSM's design.

## *CONCLUSION*

Accordingly, for the foregoing reasons, defendant's motion for summary judgment is granted on all counts.