Ollis v. Digital                    CV-95-043-M   03/28/97

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE


<u>Mary E. Ollis</u>

     v.                                        Civil No. 95-43-M

<u>Digital Equipment Corporation</u>


**O R D E R**


     Mary Ollis brings suit against her former employer, Digital Equipment Corporation, charging sexual harassment and constructive discharge in violation of Title VII, 42 U.S.C.A. § 2000e, <u>et seq.</u>  The suit is based on the behavior of a fellow employee, Evely Gonzalez.  Ollis asserts that Gonzalez's harassing behavior created a hostile work environment that eventually forced her to quit.  Digital has moved for summary judgment, arguing that the workplace conflict between Ollis and Gonzalez was nonsexual in nature and amounted to a personality conflict not actionable under Title VII.  Digital also asserts that, in any event, it took prompt and appropriate remedial action.  For the reasons that follow, summary judgment in favor of Digital is necessarily denied.


**<u>STANDARD OF REVIEW</u>**

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party first must show the absence of a genuine issue of material fact for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).  If that burden is met, the opposing party can avoid summary judgment on issues that it must prove at trial only by providing properly supported evidence of disputed material facts that would require trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Lawton v. State Mutual Life Assurance Co. of America, 101 F.3d 218, 223 (1st Cir. 1996) (nonmoving party obligated to provide "more than steamy rhetoric and bare conclusions").

The court interprets the record in the light most favorable to the nonmoving party, the plaintiff in this case, and resolves all inferences in her favor.  McIntosh v. Antonino, 71 F.3d 29, 33 (1st Cir. 1995).  Accordingly, summary judgment will be granted only if the record shows no trial worthy factual issue and the moving party, the defendant here, is entitled to judgment as a matter of law.  EEOC v. Green, 76 F.3d 19, 23 (1st Cir. 1996).  Even in discrimination cases, however, summary judgment

2

may be granted if the nonmoving party relies "'upon conclusory allegations, improbable inferences, and unsupported speculation' as to any essential element in her claim." Byrd v. Ronayne, 61 F.3d 1026, 1030 (1st Cir. 1995) (quoting Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)).

Affidavits filed in opposition to summary judgment must be based on admissible and competent evidence. Fed. R. Civ. P. 56(e); LaRou v. Ridlon, 98 F.3d 659, 663 (1st Cir. 1996). A party opposing summary judgment cannot create a genuine factual dispute by providing an affidavit that contradicts her own previous deposition testimony without a satisfactory explanation of why her testimony has changed. Colantuoni v. Alfred Calcagni & Sons, Inc., 44 F.3d 1, 45 (1st Cir. 1994).

Digital moved to strike Mary Ollis's affidavit as well as an evaluation prepared by James T. McMahon, Ed.D., which were submitted in support of her objection to summary judgment. Ollis, through counsel, filed a counter motion to strike Digital's motions on the grounds that Digital had not sent him copies of its motions, as certified. At the hearing on the summary judgment motion Ollis's counsel was given an opportunity to submit a new affidavit in proper form, which has been done.

Neither party addressed the motion to strike McMahon's evaluation at the hearing, and Ollis has not objected to the

3

motion on the merits. Digital objects to McMahon's evaluation on the grounds that it contains hearsay, lacks foundation, and offers opinions beyond the expertise of the witness. See Hayes v. Douglas Dynamics, Inc., 8 F.3d 88, 92 (1st Cir. 1993), cert. denied, 511 U.S. 1126 (1994). Ollis offers nothing in response and, in fact, does not rely on the evaluation in objecting to summary judgment. Accordingly, the evaluation by Dr. McMahon is stricken. See Horta v. Sullivan, 4 F.3d 2, 8 (1st Cir. 1993).

Digital has also moved to strike Ollis's second affidavit, but objects specifically to only one statement: "I was subjected to sexual harassment by a co-worker, Evely Gonzalez, from December 1993 until I resigned my job in June 1994." The court agrees that the challenged statement is not competent evidence as it is merely a conclusory assertion of Ollis's legal theory. See Horta, 4 F.3d at 8. Consequently, the statement is stricken from the affidavit and will not be considered for purposes of deciding summary judgment. In addition, to the extent that Ollis's deposition testimony clearly conflicts with statements in her affidavit, without any explanation of the obvious conflict, where conflict exists, her deposition testimony will be considered reliable.

## BACKGROUND

4

Mary Ollis worked in the mail room at Digital with Evely Gonzalez for about a year and a half before friction arose between them in late 1993. At that time, Ollis had known Gonzalez and his wife for about eight years. Ollis contends that Gonzalez told her in December 1993 that his wife was returning to Puerto Rico to live. At about the same time, Gonzalez learned that Ollis was planning a vacation for the first two weeks in February, without her husband. Thereafter, during December 1993 and January 1994, Gonzalez followed Ollis into the parking lot at lunch time on a number of occasions, pestering her to go to lunch with him. She refused his invitation each of the twelve or more times that he asked, and changed her lunch hour to avoid him. Gonzalez also suggested to Ollis that she take him on a vacation if she wanted to vacation with "a real man" and "have a real good time." Ollis told Gonzalez that his remarks were offensive and unwelcome, and she warned him that she would report him to their supervisor, Joseph Foti. Ollis says in her affidavit that Gonzalez responded by telling her that he had Foti under his thumb, that he would deny it, and he would make her life miserable. During the two days before her vacation, Gonzalez reminded Ollis three or four times that she still had time to change her mind and take him with her. After discussing the situation with her husband, however, Ollis decided not to talk to

5

her supervisor because she wanted to avoid making the problem worse.

Ollis testified in her deposition that Foti, the mail room supervisor, approached her in December or January and reported that a cleaning crew member named Sylvia had accused Gonzalez of taking plastic trash bags from Digital without permission.[1] Foti told her that Sylvia did not want to become involved further because stealing was grounds for dismissal from Digital, and Sylvia was afraid of what Gonzalez might do if he were dismissed based on her accusations. Foti asked Ollis if she had seen Gonzalez take any company property. Ollis responded that she had seen Gonzalez in the shipping department with extra bags in his hand and that when he saw her he dropped the bags back into a bucket and seemed nervous. She then saw him put a pile of trash bags into a drawer in his desk and lock it. Ollis told Foti, however, that she, like Sylvia, would not make a formal complaint against Gonzalez.

After her vacation, Ollis noticed that Gonzalez no longer spoke to her. She, in turn, did not speak to him, although she did not know what prompted the change. In her deposition

---

[1] Ollis understood that Gonzalez ran a contract cleaning business on the side, and apparently was suspected of using Digital supplies in his private business.

testimony and her affidavit, Ollis described several incidents and circumstances, which occurred during February and March, that caused her to become anxious about Gonzalez. Within a day or two of her return from vacation, Gonzalez complained to Foti that Ollis was behaving unfairly toward him by piling books for him to sort on the floor, rather than putting them on his workbench. Ollis asserts that she had not changed her practice of leaving heavy mailbags, such as those containing books, on the floor.[2] Ollis heard Gonzalez mutter comments to himself when she was alone in the room with him, such as "I won't be picking up the books off the floor for very long," and "We'll see who wins."

Gonzalez also refused to transfer telephone calls or to take messages for Ollis. Ollis complained to Foti about missing her telephone calls, and Gonzalez complained to Foti about Ollis's continuing to put the mail and books for sorting on the floor. The situation continued to deteriorate prompting Foti to meet with Ollis several times during February and March to discuss the escalating friction between her and Gonzalez.

Ollis also noticed that Gonzalez began to arrive at work before his shift. He apparently loitered in the mail room,

---

[2] In December, there had been an argument among the mail room staff, instigated by another employee, about the way in which their work was being done.

sometimes in the dark, until Ollis arrived.  He would then glare at her, which frightened her.  He continued to mutter in a threatening way under his breath in her presence.  Although at the time she did not interpret his behavior or mutterings to be sexually oriented or gender based, she says she was anxious for her personal safety.

At about the same time, Sylvia, from the cleaning crew, began making comments about missing trash bags when cleaning the mail room, aimed at Gonzalez.  Ollis saw Gonzalez take a trash bag full of things from his bottom drawer, leave the mail room, and return with an empty bag.  He appeared nervous.  In March, while Foti was on vacation, Ollis saw Gonzalez carrying a plastic trash bag out of the mail room.  The bag broke, spilling a pile of miscellaneous office supplies onto the floor.  Gonzalez glared at her angrily and walked away without comment or explanation.  After each of these incidents, Ollis testified in her deposition, Gonzalez seemed more nervous, and relations between them worsened.

Foti told Ollis, during one of their meetings, that Gonzalez suspected Ollis of reporting that he was not performing his work properly.  At one of those meetings in mid to late March 1994, Foti specifically asked Ollis about the lack of communication and other apparent problems between her and Gonzalez.  Ollis says

8

that she told Foti that she did not understand what Gonzalez was upset about or what he was trying to do.  Because she felt that things had deteriorated anyway, Ollis at that time first reported Gonzalez's earlier sexually suggestive remarks about taking him with her on vacation.

Foti responded by encouraging Ollis to file a sexual harassment complaint with a Digital human resources representative, and he gave her a copy of Digital's sexual harassment policy to review.  Ollis refused to file a complaint. She explains in her affidavit and deposition testimony that she was afraid of retaliation by Gonzalez if she made a written complaint, but says she would have met personally with a human resources representative (but did not ask for such a meeting or make her willingness known).

Foti states in his affidavit that Ollis also asked him not to take further action or to talk about the incident with others, but Ollis denies having said that.  Nevertheless, contrary to what he at least believed were Ollis's wishes, Foti went ahead and notified a Digital human resources representative about the problems anyway.  The human resources representative recommended that Foti, as supervisor, investigate the matter and question others who worked with Ollis and Gonzalez.  Foti questioned each of the mail room employees, but found that none confirmed Ollis's

9

reports about Gonzalez's sexually suggestive remarks, or his alleged theft of Digital property. One mail room employee, Carol Vaillancourt, insists in her affidavit that she worked closely with Gonzalez, that he was never offensive or hostile toward her, and that she never saw or heard him do or say anything offensive, hostile, or inappropriate toward Ollis. Ollis counters in her affidavit that Vaillancourt and another employee, Guy Toupin, knew of the problems and that Toupin urged her to report Gonzalez's sexual comments.

On April 1, Ollis contacted Foti to report that an unidentified person had called her home the night before, spoke to her husband, and threatened that if Gonzalez lost his job, "someone else will be just as sorry." Ollis believed the telephone call was aimed at stopping her from accusing Gonzalez of stealing from the company. She told Foti during the April 1 meeting that she was nervous, losing sleep, and having stomach problems due to her anxiety about the situation with Gonzalez. She wanted Foti to explain to Gonzalez that she had not accused him of theft, or, alternatively, she wanted to confront Gonzalez about the issue. Foti responded that he did not want to confront Gonzalez, and did not want her to do so either, because there was more going on at the time, apparently referring to an ongoing company investigation of Gonzalez. During that meeting, Ollis

10

also informed Foti about the time she saw Gonzalez carrying the plastic trash bag that broke spilling office supplies.

On April 4, Ollis sent an electronic mail message to Foti informing him that Gonzalez was intercepting her interoffice messages and asking for his help to put a stop to it. Foti agreed to talk to Gonzalez (but Ollis believes that he never did). Gonzalez was in a car accident and was out of work from April 5 until the end of the month. Ollis experienced no difficulties while Gonzalez was out of work.

When Gonzalez returned on April 26, he and Ollis again argued about whether she had moved his books and mail from his bench to the floor. Foti spoke to each of them. Ollis denied having moved the books, explaining that another mail room employee had "messed up" Gonzalez's books as a prank, although Ollis had warned him not to because she was afraid she would be blamed. The same employee had played a previous prank on Gonzalez that Gonzalez then blamed on Ollis. Although the other employee confessed, Gonzalez remained angry at Ollis, shouting at her that he could accuse anyone he wanted to, that she did not know who she was dealing with, and that he would do "whatever it takes."

That incident was also reported to Foti, who again contacted the human resources department to report that the conflict

11

between Ollis and Gonzalez was escalating and, in his opinion, required intervention. Foti described the past incidents as "possible sexual/threatening harassment" and "harassment and threatening . . . demonstrated by [Gonzalez] towards [Ollis]." Matt Sepe, from human resources, met with Gonzalez and Ollis individually. Gonzalez denied making sexual comments or veiled threats to Ollis, and in turn complained that she was making his job more difficult by putting piles of mail on the floor. Sepe states in his note about the meeting that he informed Gonzalez that Ollis's complaints were serious, and, if true, his employment could be terminated.

Ollis, who lived in Saugus, Massachusetts, contacted the Saugus Police Department that same day (April 26) about Gonzalez's threats at work. The police told Ollis that Gonzalez had a prior criminal record and advised her to work with the personnel department at Digital. On April 28, Ollis received ten to sixteen anonymous "hang up" telephone calls at her home, which she promptly reported to Matt Sepe. Ollis warned Sepe that she intended to report Gonzalez's threats and calls to the Nashua Police Department. Sepe discouraged her and assured her that he would have a meeting to deal with the problems.

A meeting was held the next day (April 29) among Ollis, Gonzalez, Foti, Matt Sepe, and Jim DiRico, the Digital facility

manager.  Sepe's notes indicate that Gonzalez again denied making threats against Ollis.  Sepe directed Foti and DiRico to monitor the situation between Gonzalez and Ollis and to work with security to watch Gonzalez.  Ollis says in her affidavit that Gonzalez initially denied the remarks, but then admitted that it could have happened, and he did not deny making the telephone calls.  Sepe reported that at another meeting between Ollis and Gonzalez held a short time later (May 2), Gonzalez denied making any threats toward Ollis and said that he was sorry if Ollis interpreted their argument as threatening.

Foti and the human resources department considered moving Gonzalez to another department, and Sepe told Ollis that Gonzalez would be moved.  In the meantime, the company temporarily moved Ollis to the copy center and then divided Gonzalez's time between the mail room and shipping.  When she was back in the mail room, Ollis reported to Sepe several times that Gonzalez was still in the mail room, but he admonished her to let Foti handle the situation.  Ollis also reported to DiRico that Gonzalez was still in the mail room when he was supposed to be in shipping.  Ollis continued to complain to Foti that Gonzalez was waiting in the mail room when she arrived in the morning, which continued to cause her anxiety.  Ollis asked to have her hours changed so that there would be other people around when she began work, but Foti

13

refused the change. Instead, he told Ollis that he would assign work to Gonzalez during the first hour, ostensibly to give him something to do away from the mail room.

For his part, Gonzalez again complained that Ollis was not putting his mail on his bench for sorting, although she did so for other mail room employees, and that management was not addressing the problem between them. Gonzalez filed a "corporate" complaint about being treated unfairly in connection with the ongoing problem with Ollis. One of the other mail room employees told Foti that Ollis seemed to be going out of her way to put Gonzalez's mail on the floor.

On May 20, the mail room employees attended a meeting with Foti to address mail sorting and work-related issues. Foti's report of the meeting discloses that there was a difference of opinion between Ollis and Gonzalez "as to who is doing what to whom." After discussion, they agreed that only bags of mail too heavy to lift and sort on the benches would be left on the floor. Foti also changed the hours of all mail room staff so that they would all work the same shift. Ollis objected to that schedule. Several days later, Ollis complained to Foti that she was unhappy that Gonzalez won the argument about the proper way to sort mail and that her way, not Gonzalez's, was right. An office

14

memorandum to Gonzalez from Foti says that he was to begin to work in shipping as of May 25.

Jim DiRico reported in an office memorandum that he met with Ollis at her request on May 23 to discuss her concerns about Gonzalez's impact on Ollis's job performance. DiRico told her that Gonzalez was to be moved to shipping. When he asked her if she felt that management was taking the right action, she responded that they were trying but it was not working. He talked with her about Digital's open door policy, and she said that she knew that she could go above the facility management at any time. An interoffice memorandum from Foti to Sepe and DiRico dated May 25 reports that Foti transferred Gonzalez to shipping as of that date, both to fill a place in shipping and to separate Gonzalez and Ollis, each of whom felt threatened by the other. In the memorandum, Foti also states that he will ask security to investigate Ollis's allegations of theft and threats of violence.

A security department report dated May 27, 1994, prepared by investigator Tracey Greenwood, describes a meeting among Greenwood, Sepe, and Ollis held on that date. The report summarizes the problems and incidents Ollis had reported relative to Gonzalez. At that meeting, the report states, Ollis said she was concerned about comments and allegations Gonzalez might make against her, that she did not know "what he's up to," and that

15

she was uneasy around him.  When asked what might have caused the friction between her and Gonzalez, Ollis mentioned her rejection of Gonzalez's suggestion that she take him with her on vacation, the theft issue, and Gonzalez's complaints about her work performance.  Greenwood and Sepe told Ollis that the company would provide an escort to and from her car and other accommodations designed to make her feel safe.  Ollis replied that she was not afraid of a physical confrontation with Gonzalez, but was concerned about arguments and false accusations he might make against her.

Although Gonzalez was officially transferred to shipping as of May 25, 1994, Ollis contends that he did not actually work in shipping while she was employed at Digital; her employment continued until June 10.  While the record is not clear, Gonzalez may have been out of work during that time due to disability.  By the end of May, Ollis was considering leaving her job because she was experiencing increased anxiety and stomach problems.  Ollis recalls that Matt Sepe told her that he believed Foti was "dragging his feet" in dealing with Gonzalez.  However, Ollis reports no complaints or problems with Gonzalez after May 26, 1994.

On May 31, 1994, Foti met with his staff and changed their working hours to a uniform 8 a.m. to 5 p.m. shift (Gonzalez did

16

not attend, apparently because he was out on disability having injured his back).  Immediately after that meeting, Ollis gave notice to Foti that she intended to resign because of the change in hours, but also because of the situation with Gonzalez.  In her deposition, Ollis explained that she did not want to arrive and leave work at the same time as Gonzalez.

Ollis submitted her resignation on June 6, and her employment at Digital ended on June 10, 1994.  Ollis's personnel records describe the reason for her departure as follows: "Employee leaving because she felt threatened by another employee who is currently the subject of a corporate investigation."

After obtaining a "right to sue" letter from the Equal Employment Opportunity Commission on January 13, 1995, Ollis filed suit in this court, on January 26, 1995, alleging that Digital had allowed her to be subjected to sexual harassment in violation of Title VII, which forced her to quit her job.

## DISCUSSION

Digital contends that Ollis cannot show that Gonzalez's conduct, which prompted her resignation, constituted sexual harassment or caused her constructive discharge under Title VII.  In addition, Digital asserts, even if she could satisfy the discrimination element of a Title VII claim, she cannot show that

17

Digital failed to act reasonably under the circumstances. Ollis counters that Gonzalez's hostile and threatening conduct toward her was motivated by her rejection of his lunch invitations and his remarks implicitly suggesting a sexual relationship, and that Digital failed to stop Gonzalez's harassment despite knowledge of the conflict between them.

## A. Sexual Harassment

Title VII prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C.A. § 2000e-2(a)(1). Harassment based on the sex of the victim constitutes actionable discrimination under Title VII. Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 66 (1986); see also 29 C.F.R. § 1604.11(a) (Equal Employment Opportunity Commission's interpretation of Title VII's prohibition of sexual harassment). Sexual harassment occurs in two forms. "Quid pro quo harassment" consists of "promises of favorable treatment or threats of unfavorable treatment calculated to coerce an employee into submitting to unwelcome sexual advances." Lattimore v. Polaroid Corp., 99 F.3d 456, 463 (1st Cir. 1996). "Hostile environment harassment" consists of "offensive, gender-based

18

conduct that is 'severe or pervasive enough to create an objectively hostile or abusive work environment — an environment that a reasonable person would find hostile or abusive' and is subjectively perceived by the victim to be abusive." Id. (quoting Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993)).

To maintain a hostile work environment sexual harassment claim, a plaintiff must show:

> (i) that he/she is a member of a protected class; (ii) that he/she was subject to unwelcome sexual harassment; (iii) that the harassment was based upon sex; (iv) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's [employment] and create an abusive [employment] environment; and (v) that some basis for employer liability has been established.

Brown v. Hot, Sexy and Safer Productions, Inc., 68 F.3d 525, 540 (1st Cir. 1995) (listing elements, taken from Title VII cases, in context of Title IX case), cert. denied, 116 S. Ct. 1044 (1996); see also Hayes v. Henri Bendel, Inc., 945 F. Supp. 374, 380 (D. Mass. 1996). Whether a sexually abusive hostile environment[3]

---

[3] Courts have recognized that retaliation based upon rejection of sexual overtures or a prior relationship may be sexual harassment in the Title VII context. See Fuller v. City of Oakland, Cal., 47 F.3d 1522, 1528 (9th Cir. 1995); Babcock v. Frank, 729 F. Supp. 279, 287 (S.D.N.Y. 1990); Keppler v. Hinsdale Tp. High School Dist. 86, 715 F. Supp. 862, 867 (N.D. Ill. 1989); Hollis v. Fleetguard, Inc., 668 F. Supp. 631, 635-37 (M.D. Tenn. 1987), aff'd 848 F.2d 191 (6th Cir. 1988); but see Galloway v. General Motors Serv. Parts Operations, 78 F.3d 1164, 1168 (7th

existed in the plaintiff's workplace must be determined from the totality of the circumstances taken from the record as a whole. Lipsett v. University of Puerto Rico, 864 F.2d 881, 897-98 (1st Cir. 1988). A hostile environment analysis contains both objective and subjective elements, see Brown, 68 F.3d at 540, so that to avoid summary judgment in this case, Ollis must be able to show both that a reasonable person in her position would have felt that her work environment was hostile based on her sex and that she actually perceived such discriminatory abuse.

The record, taken in the light most favorable to Ollis, establishes that Ollis, a woman, is a member of a protected class; that Gonzalez made unwelcome overtures of a sexual nature to her; that Gonzalez later subjected her to harassment that was hostile, but was not explicitly, implicitly, or suggestively

Cir. 1996); Carter v. Caring for the Homeless of Peekskill, 821 F. Supp. 225, 229-30 (S.D.N.Y. 1993). In addition, courts have found that conduct which is not explicitly sexual may nevertheless constitute sexual harassment if the abusive treatment is based on or aimed at the gender of the victim. See, e.g., Morrison v. Carelton Woolen Mills, Inc., No. 96-1224, slip op. at 30 (1st Cir. Mar. 19, 1997); King v. Hillen, 21 F.3d 1572, 1583 (Fed. Cir. 1994); Kopp v. Samaritan Health Sys., Inc., 13 F.3d 264, 269-70 (8th Cir. 1993); Hall v. Gus Const. Co., 842 F.2d 1010, 1013 (8th Cir. 1988); Ruffino v. State Street Bank and Trust Co., 908 F. Supp. 1019, 1036 n.28 (D. Mass. 1995). Explicitly sexual harassment motivated by personal enmity or hooliganism, rather than the gender of the victim, also may be actionable under Title VII. See Quick v. Donaldson Co., Inc., 90 F.3d 1372, 1379 (8th Cir. 1996); Burns v. McGregor Electronic Industries, Inc., 989 F.2d 959, 965 (8th Cir. 1993); Winsor v. Hinckley Dodge, Inc., 79 F.3d 996, 1002 (10th Cir. 1996).

20

sexual in character; and that Digital was aware of Gonzalez's conduct and Ollis's objection to it.

Digital contends that Ollis cannot show that Gonzalez's hostile conduct, following Ollis's vacation, was based on sex. Thus, the connection between Gonzalez's sexually suggestive remarks before Ollis's vacation and his presumed hostile conduct after her vacation is essential to Ollis's claim.

Ollis provides little factual support in her opposition to summary judgment for her claim that Gonzalez's subsequent hostility was sexually motivated.[4] She states, in a conclusory fashion, that Gonzalez's invitations and remarks before her vacation "evolved into threats, intimidation, and false accusations which hindered her work performance and created a

---

[4] In disparate treatment cases, when direct evidence of discriminatory intent is not available, the court employs the burden-shifting analysis established in <u>McDonnell Douglas Corp v. Green</u>, 411 U.S. 792 (1973), "to sharpen the inquiry into the elusive factual question of intentional discrimination." <u>Texas Dept. of Community Affairs v. Burdine</u>, 450 U.S. 248, 255 n.8 (1981). Because sexual harassment as a form of disparate treatment is ordinarily explicitly sex-based, most sexual harassment claims include direct evidence of discriminatory intent, making the <u>McDonnell Douglas</u> analysis unnecessary. <u>See, e.g.</u>, <u>Chamberlin v. 101 Realty, Inc.</u>, 915 F.2d 777, 782 n.7 (1st Cir. 1990); <u>Andrews v. City of Philadelphia</u>, 895 F.2d 1469, 1482 n.3 (3d Cir. 1990). Although direct evidence is absent in this case, the burden-shifting analysis does not resolve the issue of discriminatory intent as the record provides credible evidence of other reasons for Gonzalez's conduct — the matter of his alleged pilfering of Digital supplies and his perceptions about Ollis's reporting his conduct.

hostile environment, until she resigned in June 1994." However, she points to no evidence in the record to connect Gonzalez's early remarks to his later conduct, other than that she suspected that her negative response to Gonzalez's suggestive remarks, along with other possible issues, might be the cause of Gonzalez's hostility. Although the most likely cause of Gonzalez's hostile behavior seems to have been a work-related conflict with Ollis, see Callanan v. Runyun, 75 F.3d 1293, 1296 n.4 (8th Cir. 1996), nevertheless, under the applicable summary judgment standard, all reasonable inferences, including the inference that Gonzalez's abusive conduct was linked to his earlier sexual remarks, must be resolved in Ollis's favor. Cf. Morrison v. Carleton Woolen Mills, Inc., No. 96-1224, slip op. at 31-32 (1st Cir. Mar. 19, 1997) (on review of verdict following trial, appeals court ruled that the evidence did not establish a connection between earlier sexual and later nonsexual workplace harassment).

The factual record presented here could support an inference that Gonzalez's hostility was in retaliation for Ollis's rejection of his earlier implicit sexual invitation. An inferred connection between Gonzalez's sexually suggestive remarks and his later hostility toward Ollis is sufficient to create a factual question as to whether his harassing behavior was or was not

22

sexually motivated.  Therefore, based on the record presented here, Digital is not entitled to summary judgment on grounds that Ollis cannot prove the discrimination element of her sexual harassment claim — perhaps she can, but whether she can or cannot turns on disputed material facts.

## B.  Digital's Response

Employers are not strictly liable under Title VII for acts of sexual harassment perpetrated by their employees.  But, employers are not automatically shielded from liability just because they have a policy against discrimination enforced by an established grievance procedure.[5]  Meritor Savings Bank v. Vinson, 477 U.S. 57, 72-73 (1986).  Instead, employers are liable if they knew, or should have known, of sexual harassment and failed to take "'appropriate steps to halt it.'".  Morrison v. Carleton Woolen Mills, Inc., No. 96-1224, slip op at 18-19 (1st Cir. Mar. 19, 1997) (quoting Lipsett, 864 F.2d at 901); see also Waymire v. Harris County, Tex., 86 F.3d 424, 428 (5th Cir. 1996);

---

[5]  Digital has not argued that its sexual harassment policy, or its open door policy, had they been invoked by Ollis, would have been more effective than the procedure that was followed. See, e.g., Gary v. Long, 59 F.3d 1391, 1398 (D.C. Cir.), cert. denied, 116 S.Ct. 569 (1995); Bouton v. BMW of North America, Inc., 29 F.3d 103, 107 (3d Cir. 1994).  Digital also has not filed a copy of either policy with the court.

Hayes, 945 F. Supp. at 380.  An employer is obligated to take reasonable steps, under the circumstances, to end harassment. DeGrace v. Rumsfield, 614 F.2d 796, 805 (1st Cir. 1980).  "What is appropriate remedial action will necessarily depend on the particular facts of the case — the severity and persistence of the harassment, and the effectiveness of any initial remedial steps."  Waltman v. International Paper Co., 875 F.2d 468, 479 (5th Cir. 1989).  An employer is not obligated to implement the most effective remedial measures as long as it responds with reasonably adequate remedial efforts.  Spicer v. Commonwealth of Virginia, Dep't of Corrections, 66 F.3d 705, 710-11 (4th Cir. 1995) (en banc).  An employer who is on notice of allegations of sexual harassment will not be liable under Title VII if "[i]t took the allegations seriously, it conducted prompt and thorough investigations, and it immediately implemented remedial and disciplinary measures based on the results of such investigations."  Carmon v. Lubrizol Corp., 17 F.3d 791, 795 (5th Cir. 1994).

On the factual record presented for summary judgment, it is undisputed that Ollis did not notify Digital of Gonzalez's sexually suggestive remarks (the lunch invitations and vacation suggestions) before March 15, 1994, when she told her supervisor, Joe Foti, about those remarks in the context of a discussion

24

related to general workplace hostility and friction between her and Gonzalez. Ollis does not contend that Digital should have known any sooner that the conflict between them might be sexually motivated. Accordingly, Digital's response to the conflict between Ollis and Gonzalez, beginning with Ollis's report to Foti about Gonzalez's sexually suggestive remarks, must be examined to determine whether Digital made reasonable and appropriate efforts under the particular circumstances presented in this case.

When Ollis reported Gonzalez's remarks, Foti urged her to file a formal sexual harassment report, gave her a copy of Digital's sexual harassment policy, and, when she declined to file an official complaint, Foti sought advice from Digital's human resources department, despite his understanding that Ollis did not want him to take any action. Foti then acted on the advice obtained from the human resources department and investigated Ollis's report by questioning Ollis's and Gonzalez's fellow employees. That effort did not reveal facts or evidence sufficient to corroborate Ollis's charges. Nevertheless, Foti did not drop the matter; he remained concerned about the friction between Ollis and Gonzalez and continued to meet with them and others in an attempt to resolve what appeared to him to be ongoing workplace conflict primarily (though perhaps not

25

entirely) based on an ordinary dispute between co-workers rather than one involving sexual harassment.

When the conflict between Ollis and Gonzalez escalated in late April, Foti again sought assistance from the company's human resources department.  Foti identified the conflict as possibly related to sexual harassment or threatening harassment, despite the thin factual support developed during his investigation to support a claim that gender bias or sexual motivation was driving the conflict.  Matt Sepe, from the company's human resources department, met with Gonzalez and directly warned him that Ollis's complaints were serious, and that if they were true, he could be fired.  Digital management then began to work on ways to separate Ollis and Gonzalez during the workday as a means of resolving the problem in a manner fair to both employees, still without any substantial corroborating evidence that the friction between them was anything other than work-based conflict.  While Ollis complained to Foti, Sepe, and others about Gonzalez, Gonzalez also complained about unfair treatment of him and favoritism toward Ollis.

When the conflict still did not abate, Digital took stronger action, transferring Gonzalez from the mail room to the shipping department.  Ollis contends that the transfer was ineffective, but made no further complaints about incidents involving Gonzalez

26

and harassing activities. At the end of May, Digital voluntarily offered Ollis an escort service and any other accommodation that she might feel necessary for her safety, but she declined, explaining that her concern at that time was not personal safety but false accusations from Gonzalez.

Thus, the record shows that from mid-March, when Ollis first told Foti about Gonzalez's implicitly sexual remarks, until Ollis resigned in early June, a period of less than three months, Digital took Ollis's complaints seriously, affirmatively investigated the situation, acknowledged the possibility of sexual harassment even though the conflict seemed primarily work-related and not gender based, and met with Gonzalez and Ollis, made it clear to Gonzalez that Ollis's complaints were serious, and threatened him with losing his job if Ollis's complaints were confirmed. Finally, when the company's initial remedial efforts failed to resolve the conflict between the two employees, Digital took more affirmative steps, transferring Gonzalez to the shipping department. Whether Gonzalez's transfer effectively resolved the conflict is not known because Ollis quit before it could be tested. Digital's remedial actions were all taken even though its investigation provided little evidence corroborating Ollis's claim that Gonzalez's harassment was sexually motivated or motivated by gender bias.

27

This court might reasonably conclude, as a matter of law, that Digital management responded to Ollis's complaints and concerns promptly and appropriately, particularly given the difficulty of assessing, fairly to both parties, the actual causes of, nature of, and severity of the problem. Cf. Morrison v. Carleton Woolen Mills, Inc., No. 96-1224, slip op. at 22-23 (1st Cir. Mar. 19, 1997) (evidence established that management was aware of harassing conduct and discriminatory atmosphere but allowed situation to continue without taking any corrective action); see also, e.g., McCoy v. Macon Water Auth., ___ F. Supp. ___, 1997 WL 50037 (M.D.Ga. Feb. 5, 1997) ("It is not necessary for an employer to fire, suspend, or demote [an employee] whenever a complaint of sexual harassment is made. In some situations, particularly when there is some doubt as to the seriousness or the veracity of the charge or when the complainant is unwilling to state a formal charge, less drastic measures, such as warning the accused harasser, or reiterating the policy on harassment, will be more appropriate."); Callender v. Ergon, Inc., 928 F. Supp. 665, 668 (S.D. Miss. 1996) ("This Court cannot create a perfect world within a work environment nor can we require employers to do the same. Rather, we must ensure that employers prevent their working conditions from palpably deteriorating because of sexually hostile conduct.")

28

But, that legal conclusion is not unavoidable given the factual record. Though plaintiff's case appears to be almost terminally weak on the merits, still, a reasonable factual inference could be drawn in Ollis's favor (as mandated by the applicable summary judgment standard all facts and reasonable inferences must be construed in her favor at this juncture) to the effect that Digital was "dragging its feet" in dealing with Gonzalez, as Ollis says Sepe opined. A reasonable jury might also conclude that Digital's efforts to stop the conflict and separate Gonzalez and Ollis before the end of May were not adequate, were ineffective, and even that the workplace conflict was sufficiently severe and pervasive (threats, implied threats, implicitly and actually threatening phone calls — all directly tied to rejected sexual overtures) to interfere with her work, as Foti noted several times in his interoffice memoranda. The absence of harassing incidents after Gonzalez was transferred to shipping also might be found to have been attributable to little more than Gonzalez's absence from work, rather than to the effectiveness of Digital's remedial action. For example, the record shows that in the recent past Gonzalez continued to show up in the mail room when he was at work, notwithstanding his temporary assignments to the shipping department, and that the

29

two departments were in close proximity (negating the likely effectiveness of the "separation").

Accordingly, although plaintiff's showing is thin, and she survives defendant's motion for summary judgment by only the margin of a factual inference or two that could serve to parry the company's defense, the factual record as it currently stands does not adequately support the conclusion at this juncture that Digital fulfilled its obligations under Title VII, as a matter of law, by taking reasonable and appropriate remedial measures to prevent sexual harassment of Ollis by Gonzalez. Thus, Digital is not entitled to summary judgment on Ollis's claim.

C.  **Constructive Discharge**

Digital challenges Ollis's constructive discharge claim only on grounds that she cannot prove that she was the victim of sexual harassment. As the sexual harassment issue remains to be resolved, Digital is not entitled to summary judgment on Ollis's constructive discharge claim based on the grounds it raises. The facts presented do suggest that Ollis may have resigned before she gave Digital's remedial efforts, particularly Gonzalez's permanent transfer to the shipping department, a reasonable chance to work. If Ollis's resignation occurred before Digital's remedial efforts were given a reasonable opportunity to succeed,

30

then Ollis may have preempted the possibility of showing that Gonzalez's transfer failed to remediate her working conditions. See Serrano-Cruz v. DFI Puerto Rico, Inc., No. 96-1418, slip op. at 11 (1st Cir. Mar. 19, 1997). As the parties have not addressed the issue raised in Serrano-Cruz, however, that is not an appropriate basis for summary judgment on the present record.

## CONCLUSION

For the foregoing reasons, Digital's motions to strike (documents no. 22, 23, and 30) are granted as described herein. Ollis's motion to strike (document no. 27) is denied. Digital's motion for summary judgment (document no. 18) is necessarily denied on this record.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

March 28, 1997

cc:  Vincent C. Martina, Esq.
     Steven M. Gordon, Esq.
     Richard H. Alpert, Esq.